UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIAM ROGER CLEMENS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-00471 |
| | § | |
| BRIAN MCNAMEE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendant Brian McNamee's Motion to Disqualify Rusty Hardin, Esq. and Rusty Hardin & Associates, P.C. (Doc. No. 21). After carefully reviewing the Motion, all responses and replies thereto, and the relevant law, the Court finds that McNamee lacks the requisite standing to raise this objection, and therefore the Motion should be denied.

### I.  BACKGROUND

The facts surrounding McNamee's Motion are essentially uncontested. According to Plaintiff William Roger Clemens and his attorney, Rusty Hardin, on December 5, 2007, Hardin received a phone call from a sports agent, Randy Hendricks, who represented both Clemens and Andy Pettitte, a professional baseball player who is not a party to this lawsuit. During this phone call, Hardin learned that McNamee had alleged to Senator George Mitchell and others, during a private investigation commissioned by Major League Baseball, that both Clemens and Pettitte had used

performance enhancing drugs, and that the two baseball players might be interested in retaining Hardin to help defend them against the allegations. Neither Hardin nor his firm, Rusty Hardin & Associates, P.C. ("RH&A"), had any dealings with either Clemens or Pettitte prior to this phone call.

On December 7, 2007, Hardin and other members of RH&A met with Hendricks to review a copy of a tape-recorded phone conversation between McNamee and one of Hendricks' colleagues in which McNamee discussed his allegations. On December 9, 2007, Hardin and other members of RH&A met with Clemens and Pettitte in person and proceeded to interview each separately, first speaking with Clemens, then Pettitte. According to Hardin, each individual was interviewed outside the presence of the other.

On December 12, 2007, RH&A sent two investigators to speak with McNamee in person about his allegations. The investigators arrived bearing two documents, signed by Clemens and Pettitte, respectively, each stating, "This is to confirm that [the investigators] work for the law firm that represents me." (Def.'s Motion, Doc. No. 21, Ex. D.) The investigators spoke to McNamee for several hours, and later that evening they debriefed Hardin and Clemens as to the details of their discussion.

On December 13, 2007, Senator Mitchell released his report, which included McNamee's allegations about Clemens and Pettitte. The same day, Hardin held a press conference at which he announced that he had been retained to represent Clemens, but not Pettitte. Subsequently, Pettitte confirmed McNamee's allegations about him; Clemens denied them and filed this lawsuit alleging defamation. Shortly thereafter, McNamee filed the instant Motion, arguing that Hardin's prior joint representation of both Clemens and Pettitte created a conflict of interest requiring the disqualification of

Hardin and RH&A. Pettitte ultimately retained his own counsel; his public testimony regarding Clemens' use of performance enhancing drugs has been subject to various and conflicting interpretations, and is likely to be central to this lawsuit. Pettitte has neither consented nor objected to Hardin or RH&A representing Clemens, although McNamee's attorney has submitted a sworn declaration stating that, according to Pettitte's current attorney, Pettitte will not waive any attorney-client privilege that attaches to his communications with Hardin. (Decl. of Richard D. Emery, Doc. No. 21, ¶ 6.)[1]

## II. ANALYSIS

The first and ultimately dispositive question that the Court must address in adjudicating the instant Motion is whether McNamee has standing to raise the issue of the alleged conflict between the duties that Hardin and RH&A owe to Clemens and Pettitte.

For the proposition that he does have the requisite standing to make this Motion, McNamee chiefly relies on two cases. The first is *In re Gopman*, which held that third parties do have standing to move for opposing counsel's disqualification by virtue of an attorney's obligation to bring ethical violations to the attention of the Court. 531 F.2d 262, 265 (5th Cir. 1976) ("When an attorney discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to that court's attention.") (citing *Estates Theatres, Inc. v. Columbia Pictures Indus.*, 345 F. Supp. 93, 98 (S.D.N.Y. 1972)). The second case is *In re American Airlines, Inc.*, in which the Fifth Circuit, discussing the judiciary's role in policing allegations of attorneys' ethical impropriety, contemplated an exceedingly

---

[1] The Court will not pause to consider the evidentiary implications of the hearsay contained in the declaration.

active, interventionist role for the district court. 972 F.2d 605, 610-11 (5th Cir. 1992), *cert. denied* 507 U.S. 912 (1993) ("We have squarely rejected [the] hands-off approach . . . holding instead that a district court is *obliged* to take measures against unethical conduct occurring in connection with any proceeding before it." (citations omitted, emphasis in original)). McNamee argues that *In re Gopman* is a binding precedent that conclusively establishes his standing, and that *In re American Airlines* affirms the Fifth Circuit's commitment to the idea that the district court should aggressively intervene to adjudicate allegations of ethical impropriety.

For the counter proposition, Clemens relies on another Fifth Circuit case, *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (5th Cir. 1976). That case, decided seventeen days before *In re Gopman*, establishes a different rule for third-party standing to move for the disqualification of opposing counsel: "As a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification"; the few "narrow exceptions" to this general rule include cases where "the unethical change of sides [is] manifest and glaring," thereby "confront[ing] the court with a plain duty to act." *Id.* at 88-89 (citations omitted). In language that directly contradicts that of *In re Gopman*, the *In re Yarn Processing* court continued:

> The underlying rules relating to attorney conflicts of interest are designed to allay any apprehension a client may have in frank discussion of confidential information with his attorney. Public confidence in the privacy of this discussion should not be impaired where the former client, having every opportunity to do so, fails to object to a new relationship involving his former attorney, and where the unethical nature of the attorney's change of sides is not manifest but would need to be shown.

> To allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist. It would place in the hands of the unauthorized surrogate powerful presumptions which are inappropriate in his hands. Courts do not generally examine the motives of a moving party in a disqualification motion. Once the preliminary showing is made by the former client, the motion must be granted regardless of whether the former client gains an advantage at the expense of his adversary. *Emle Industries, Inc.* [*v. Patentex, Inc.*, 478 F.2d 562, 574-75 (2d Cir. 1973)]. . . . We are reluctant to extend this where the party receiving such an advantage has no right of his own which is invaded.

*Id.* at 90. Clemens argues that *In re Yarn Processing*, not *In re Gopman*, is a binding precedent that prohibits McNamee from moving for Hardin and RH&A's disqualification.

Unfortunately, conflicts between panel decisions of the same court of appeals are not unknown to the federal judiciary; to resolve them, the Fifth Circuit has established a bright-line rule: "When there are conflicting panel decisions, the earliest panel decision controls." *Wade v. Hewlett-Packard Development Co. LP Short Term Disability Plan*, 493 F.3d 533, 542 (5th Cir. 2007) (citing *Camacho v. Texas Workforce Comm'n*, 445 F.3d 407, 410 (5th Cir. 2006)). For this reason, it is *In re Yarn Processing*, decided seventeen days before *In re Gopman*, to which the Court must turn to adjudicate the instant Motion. Under the general rule of *In re Yarn Processing*, because McNamee has never had an attorney-client relationship with Hardin, he does not have standing to challenge Hardin's representation of Clemens. Only Pettitte would enjoy standing to make such a challenge.

Moreover, the Court finds unavailing McNamee's argument that Hardin's alleged conflict is "manifest and glaring" sufficient to qualify for the exception identified in *In re Yarn Processing*. *See In re Yarn Processing*, 530 F.2d at 89. That case postulated, "at most, narrow exceptions to [its] general rule," one of which included cases where the ethical conflict is manifest and glaring. *Id.* That exception, however, was contemplated in context of three specific cases: *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973); *Porter v. Huber*, 68 F. Supp. 132 (W.D. Wash. 1946); and *Empire Linotype School, Inc. v. United States*, 143 F. Supp. 627, 631 (S.D.N.Y. 1956). *Id.*

Each of these cases is distinguishable from the instant case. *Emle Industries*, as described by *In re Yarn Processing*, involved a motion to disqualify that was made by a corporation which the former client controlled. *Id.* Because that motion was essentially made by the former client, *Emle* is not only materially different from the instant case, but it is an exception that proves the general rule of *In re Yarn Processing*. As for *Porter*, the *In re Yarn Processing* court noted that the conflict involved a "change of sides" that was challenged not by a third party, but by the court itself. *Id.*; *see also Porter*, 68 F. Supp. at 132 (explaining that the defendant's attorney had previously been "an employee of the plaintiff in a legal capacity" and was the superior of another attorney who had worked on the dispute that formed the basis of the case). Finally, *Empire Linotype School* involved a conflict significantly more glaring than Hardin's alleged conflict. In that case, a contract suit in which the plaintiff attempted to recover the balance of an alleged overpayment from the government, it was undisputed that plaintiff's attorney had previously administered for the defendant the very same contracts that formed the basis of the lawsuit. *Empire Linotype School*, 143 F. Supp. at 631-32. Indeed, before changing

sides to represent the plaintiff, the attorney had prepared, and even signed on behalf of the defendant, some of the most crucial documents in the case. *Id.* The *In re Yarn Processing* court noted that this conflict was so severe that the *Empire Linotype School* court "said that it would have had to take action to disqualify counsel even if the adverse party had not moved." *In re Yarn Processing*, 530 F.2d at 89. Even if Hardin's alleged conflict were as severe and extensive as McNamee has argued in the instant Motion—and the Court emphasizes that it does not so find today—it could not seriously be argued that his conflict is as severe as the blatant change of sides that occurred in *Empire Linotype School*.

In fact, the instant case is more usefully analyzed in light of a fourth case cited by the *In re Yarn Processing* court, *Estates Theatres, Inc. v. Columbia Pictures, Inc.*, 345 F. Supp. 93 (S.D.N.Y. 1972). In that case, the plaintiff, who was the current client, named the former client as a co-conspirator with the defendant (even though the former client was not itself a defendant in the case). *Estates Theatres*, 345 F. Supp. at 96. According to the *In re Yarn Processing* court, when the former client appeared by counsel to argue for disqualification, even though he was not the formal moving party, the "adverse nature" of the former client's interests, relative to the new client's, were so "open and obvious" that they "confronted the court with a plain duty to act." *In re Yarn Processing*, 530 F.2d at 89. The *In re Yarn Processing* court therefore distinguished *Estates Theatres*, noting that, unlike *Estates Theatres*, the former client in *In re Yarn Processing* had not appeared to argue in favor of disqualification, and that the conflict between the former and current clients' interests were not as severe. *Id.* Precisely the same analysis holds in the instant case. Pettitte has not appeared, through counsel or otherwise, to argue

for Hardin and RH&A's disqualification. It is true that, according to the sworn declaration of McNamee's attorney, Pettitte's attorney has indicated that Pettitte will not waive any attorney-client privilege that attaches to his communications with Hardin and RH&A. (Decl. of Richard D. Emery, Doc. No. 21, ¶ 6.) Even if this declaration accurately conveys Pettitte's current position as to the matter of Hardin's disqualification, it is a far cry from Pettitte's actually appearing in open court, through counsel or otherwise, and arguing in support of McNamee's motion. Moreover, in light of the fact that Clemens intends to characterize Pettitte's testimony, when taken as a whole, as supporting his case against McNamee, it again cannot be maintained that Pettitte's and Clemens' interests are as adverse as those of the former and current clients in *Estates Theatres*, where the current client had named the former client as a co-conspirator. For all of these reasons, the exception to the general rule of *In re Yarn Processing* for manifest and glaring conflicts, whatever that exception's breadth and content, clearly does not encompass this case.

Moreover, the continued vitality of *In re Gopman* as a rule of law in the Fifth Circuit is open to serious question, for three reasons. First and foremost, the legal context upon which the holding of *In re Gopman* depended has materially changed. Central to the *In re Gopman* court's reasoning was its finding that "an attorney who discovers a possible ethical violation concerning a matter before a court . . . is not only authorized but in fact obligated to bring the problem to that court's attention," a proposition for which the court cited *Estates Theatres*. *In re Gopman*, 651 F.2d at 265 (citing *Estates Theatres*, 345 F. Supp. at 98). *Estates Theatres*, in turn, cited as the basis for its similar finding the American Bar Association Code of Professional Responsibility Disciplinary Rule 1-103,

which stated, "A lawyer possessing unprivileged knowledge of a violation of DR 1-102 [relating to the propriety of professional conduct] shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation." *Estates Theatres*, 345 F. Supp. at 98 (quoting MODEL CODE OF PROF'L RESPONSIBILITY, DR 1-103(A)). This reporting requirement has since changed, however, and the relevant ethical rules no longer clearly require an attorney to report ethical violations of the kind at issue in the instant case to the Court. *See* Rules of Discipline for the United States District Court for the Southern District of Texas, Rule 5(a) (June 19, 2007) ("Charges that any lawyer of this bar has engaged in conduct which might warrant disciplinary action shall be brought to the attention of the court by a writing addressed *to the chief judge* with a copy to the clerk of court.") (emphasis added); Tex. Disciplinary R. Prof'l Conduct R. 8.03(a) ("a lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that *raises a substantial question as to that lawyers* [sic] *honesty, trustworthiness or fitness as a lawyer in other respects*, shall inform *the appropriate disciplinary authority*.") (emphasis added); Tex. R. Disciplinary P. Preamble ("the responsibility for administering and supervising lawyer discipline and disability is delegated *to the Board of Directors of the State Bar of Texas*") (emphasis added); Model Rules of Prof'l Conduct R. 8.3 & cmt. (1983) (A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that *raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects*, shall inform *the appropriate professional authority*."; "*A report should be made to the bar disciplinary agency* unless some other *agency*, such as a peer review agency, is more appropriate in the circumstances.") (emphasis added). If an attorney is

no longer obligated to bring opposing counsel's alleged conflict of interest to the presiding court's attention, as appears to be the case under the relevant rules of conduct, an important reason offered by the *In re Gopman* court for its holding is no longer present, and the edifice supporting *In re Gopman* is eroded.

The second reason to question the continued vitality of *In re Gopman* is the requirement of *In re American Airlines* that the moving party establish "an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify. . . ." 972 F.2d at 614. How this requirement fits with the holding of *In re Gopman* is entirely unclear from the *In re American Airlines* opinion, as that opinion does not so much as mention *In re Gopman*. This ambiguity leaves two possible ways to reconcile the cases: either the *In re American Airlines* court intended its ruling to govern only cases where a former client had moved for disqualification, in which case it omitted any discussion of *In re Gopman* because it did not intend to address the question of third-party standing; or the *In re American Airlines* court, for reasons of its own, intended to repudiate *In re Gopman* without directly referring to it. The Court cannot know which, if either, of these two interpretations is correct. The Court simply notes that the ambiguity, and the possibility that *In re American Airlines* conflicts with *In re Gopman*, provide at least some basis to believe that the Fifth Circuit, contrary to McNamee's argument, did not intend to ratify *In re Gopman* when it decided *In re American Airlines*.

The third, and significantly more far-reaching, reason to doubt the continued vitality of *In re Gopman* is that, since that case was decided, the Supreme Court has significantly tightened its requirements for showing an "injury in fact," which is a constitutional requirement for standing. *See Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560-61 (1992). While the Court need not—and does not—decide today whether or when a third party who moves for the disqualification of opposing counsel has suffered an "injury in fact," the Court does note that *Lujan* at least casts its shadow over *In re Gopman*, and thereby provides another reason to scrutinize its holding.

The Court also notes that the motivating purposes of *In re Gopman* serve to limit its holding to those situations where, even if the alleged ethical conflict is clear, the former client is unable or unlikely to move for the attorney's disqualification. *In re Gopman* specifically notes, as support for its holding, that "a lawyer's adversary will often be in the best position to discover [the lawyer's] unethical behavior." 531 F.2d at 266. Where a conflict remains hidden from the former client, where the current client's litigation occurs without any media attention, or where the former client for some reason cannot protest its former attorney's role in a case, the rationale of *In re Gopman* is compelling. But where, as here, the litigation in question occurs under the scrutiny of twenty-four hour news coverage, and where the former client has the necessary means and sophistication to intervene, *In re Gopman*'s concern with the discoverability of the attorney's ethical conflict is misplaced.

While it is the Court's responsibility to interpret and apply precedents in light of subsequent developments in the law, it is decidedly not the province of the Court to purport to declare Fifth Circuit cases dead letter where doing so is not absolutely necessary. In light of the infirmities noted above, however, the Court is convinced that *In re Gopman* must, at best, be afforded a narrow reading: where (1) an attorney's ethical conflict is manifest and glaring within the meaning of *In re Yarn Processing*, and (2) the former client is unable to raise (or appear and argue in favor of) the motion for

disqualification, *In re Gopman* affords third-party standing to seek the disqualification of opposing counsel. Applying this narrow reading to the instant case, it is clear that McNamee does not have standing to pursue the disqualification of Hardin and RH&A. As explained above, the conflict is not manifest and glaring within the meaning of *In re Yarn Processing*, and Pettitte chosen not to raise or support the motion for disqualification directly despite having every opportunity to do so.

Finally, the Court notes that *In re Gopman* adverts to the Court's "inherent authority" over the proceedings before it as a basis for entertaining a third-party motion to disqualify opposing counsel. 531 F.2d at 266 ("[I]t is beyond dispute that lawyers are officers of the court and that the courts have the inherent authority to regulate their professional conduct."). The Court does not doubt that it enjoys some inherent power to regulate the proceedings before it, but inherent power, because it is easier to invoke than to limit, must be wielded with care, if not reluctance. This case pits the venerable entitlement of a plaintiff to his counsel of choice against the vital concerns of lawyers' rectitude and the public's confidence in the legal system. High principles such as these present rhetorically appealing opportunities to invoke inherent powers, but they also create a particularly great risk that doing so will overstep the Court's authority under Article III of the Constitution. The Court is certain that today's decision will not shake the public's confidence in the legal system, especially since Pettitte can come forward to object to Hardin's and RH&A's representation himself if he is truly aggrieved. The Court therefore declines to invoke its inherent powers to override the case law discussed herein, which dictates that McNamee lacks standing to move for the disqualification of Hardin and RH&A on the basis of a conflict of interest between Pettitte and Clemens.

### III. CONCLUSION

For these reasons, Defendant Brian McNamee's Motion to Disqualify Rusty Hardin, Esq. and Rusty Hardin & Associates, P.C. (Doc. No. 21), is **DENIED**. It is further **ORDERED** that Plaintiff William Roger Clemens' response to Defendant's Motion to Dismiss (Doc. No. 20) shall be filed with the Court no later than twenty days from the date of this Order.

**IT IS SO ORDERED.**

**SIGNED** this 6th day of May, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT