UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **WILLIAM ROGER CLEMENS,** | § | |
| | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | CIVIL ACTION NO. 4:08-cv-00471 |
| | § | |
| | § | |
| | § | |
| **BRIAN MCNAMEE,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendant Brian McNamee's Motion to Dismiss. (Doc. No. 40.)
After considering the parties' filings, all responses and replies thereto, and the applicable law,
the Court finds that the Motion should be granted in part and denied in part.

### I.  BACKGROUND

#### A.  Plaintiff's Baseball Career

Plaintiff William Roger Clemens moved to Houston, Texas, from Ohio in 1977, at the
age of fifteen. (Pl. Am. Compl. ¶ 11.) Clemens played baseball at Spring Woods High School,
located in the Houston suburbs. (*Id.*) After high school, he played baseball for San Jacinto
Junior College and the University of Texas. (*Id.* at ¶ 12.)

In 1983, Clemens was drafted by the Boston Red Sox. (*Id.* at ¶ 13.) He played for the
Red Sox until 1996, when he signed with the Toronto Blue Jays. (*Id.* at ¶ 15.) It was while
playing for the Blue Jays that Clemens first met McNamee, who worked as a trainer for the
Toronto organization. (*Id.* at ¶ 16.)

In 1999, Clemens joined the New York Yankees. (*Id.* at ¶ 18.) One year later, the Yankees hired McNamee as an assistant trainer. (*Id.*) Clemens trained with McNamee through the 2001 season; afterwards, Clemens stopped working with McNamee when he learned that McNamee was facing rape allegations in Florida. (*Id.* at ¶¶ 21-22.) Eventually, sometime after 2001, Clemens chose to rehire McNamee, and they continued to train together until 2007. (*Id.* at ¶ 22.) During that time, McNamee routinely came to Houston to train Clemens and other professional athletes. (*Id.* at ¶ 22.)

Clemens retired from the Yankees in 2003. (*Id.* at ¶ 25.) In 2004, he joined the Houston Astros. (*Id.* at ¶¶ 26-27.) Clemens played for the Astros for three seasons, during which time he led the team to its first World Series appearance. (*Id.* ¶ 26.) In 2007, he signed a one-year contract with the Yankees. (*Id.* at ¶ 27.)

Clemens has since announced his intention to join the Houston Astros for his post-playing career. (*Id.*) Throughout his major league career, Clemens temporarily resided in other cities, but he returned to Texas at the end of each baseball season, where he lives with his wife and four sons. (*Id.* at ¶ 24.) His extended family resides in Texas, and his mother lived in the state until her death. (*Id.*) Clemens has never owned any real property in New York, and he has no office or business operations there. (*Id.*)

### B. McNamee's Alleged Defamatory Statements

Sometime in 1999 or 2000, McNamee told Andy Pettitte, Clemens's friend and fellow professional baseball player, that Clemens used human growth hormone ("HGH"). (*Id.* at ¶ 36.) This conversation occurred in Clemens's home gym in Houston, Texas. (*Id.*) Later, in 2003 or 2004, McNamee informed Pettitte at Pettitte's home gym in Deer Park, Texas, that Clemens had used steroids. (*Id.*)

According to Clemens's Amended Complaint, federal authorities first contacted McNamee about illegal steroid use in the summer of 2007. (*Id.* at ¶ 28.) They asked McNamee to meet with them in New York City. During this interview, the authorities told McNamee that the government had strong evidence that he was delivering packages of controlled substances, and that their evidence was sufficient to secure a conviction with a considerable prison term. (*Id.*) On the first day of interrogation, McNamee denied that Clemens had ever used steroids or HGH. (*Id.*) On the second day of interrogation, however, McNamee informed federal investigators that he had injected Clemens with steroids in 1998, 2000, 2001, and with HGH in 2000. McNamee told the investigators that these injections occurred in New York. (Doc. No. 40, Ex. 1 at ¶ 2.) McNamee alleges that he never injected Clemens with steroids or HGH in Texas. (*Id.*)

Some time later, federal authorities contacted McNamee again. (Pl. Am. Compl. at ¶ 30.) They requested that McNamee repeat his story to former United States Senator George Mitchell; McNamee agreed and did speak with the Mitchell Commission. (*Id.* at ¶¶ 32-33.) Mitchell had begun an investigation into the use of performance enhancing substances in baseball at the request of Major League Baseball, a private business enterprise. (*Id.* at ¶ 31.) The Mitchell Commission's investigation was not associated with the governmental investigation into the use of performance enhancing substances among professional baseball players. (*Id.*)

On December 13, 2007, the Mitchell Commission released its *Report to the Commissioner of Baseball of an Independent Investigation Into the Illegal Use of Steroids and Other Performance Enhancing Substances By Players In Major League Baseball* ("Mitchell Report"). (*Id.* at ¶ 34.) The Mitchell Report contained McNamee's allegedly false statements regarding Clemens's steroid and HGH use. (*Id.*) Every major Texas newspaper extensively

reported McNamee's allegedly false statements, and every national news service republished these statements, thereby disseminating them nationwide. (*Id.*)

Following the Mitchell Report's release, McNamee spoke with Jon Heyman, a senior writer for SI.com, on January 6, 2008. (*Id.* at ¶ 35.) During that interview, which took place at McNamee's home in New York, McNamee repeated his allegedly false statements regarding Clemens's steroid and HGH use. (*Id.*)   Heyman posted an article containing these statements to SI.com on January 7, 2008. (*Id.*)

Clemens filed suit against McNamee on January 16, 2008 in the 129th District Court of Harris County, Texas.  McNamee removed to this Court and later moved to dismiss. (Doc. No. 20.)  Clemens responded to the motion and simultaneously filed his First Amended Complaint. (Doc. No. 31.)  McNamee again moved to dismiss. (Doc. No. 40.)

## II.    PERSONAL JURISDICTION

McNamee argues that this Court cannot exercise personal jurisdiction over him for the statements he allegedly made to Mitchell and Heyman, because these statements occurred in New York.[1] For the reasons discussed below, the Court finds this argument persuasive.

### A.    Legal Standards

A court may exercise personal jurisdiction over a nonresident defendant in a diversity suit only to the extent permitted by the laws of Texas and considerations of constitutional due process. *Command-Aire Corp. v. Ontario Mechanical Sales and Service Inc.*, 963 F.2d 90, 93 (5th Cir. 1992).  Because the Texas long-arm statute, TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041-17.045, is coterminous with the Due Process Clause of the Fourteenth Amendment to the

---

[1] McNamee also purports to challenge the Court's personal jurisdiction over him with respect to his alleged statements to Pettitte.  Because the Court finds McNamee's arguments with respect to Pettitte to be more in the nature of a 12(b)(6) challenge, rather than an attack on the Court's jurisdiction, these arguments are discussed in a later section.

United States Constitution, U.S. Const. amend. XIV, § 1, the court's constitutional due process inquiry into personal jurisdiction also serves as an inquiry into personal jurisdiction under the Texas long-arm statute. *Command-Aire Corp.*, 963 F.3d. at 93-94.

To comport with constitutional due process, Clemens must show:   (1) McNamee purposefully availed himself of the benefits and protections of Texas law, thereby establishing "minimum contacts" with Texas such that McNamee could reasonably have anticipated being haled into court there; and (2) under the circumstances, the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* at 94 (*citing Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *and Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784 (5th Cir.1990)); *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) ("When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident.").   The minimum contacts requirement can be met through contacts sufficient to confer either specific or general jurisdiction. *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003). Specific jurisdiction exists "[w]hen a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (quotations omitted).   General jurisdiction can be exercised when a defendant's contacts with the forum state are substantial, continuous, and systematic, though unrelated to the litigation. *Id.*

Because Clemens argues that the Court has specific, as opposed to general, personal jurisdiction, Clemens's cause of action must arise from or relate to McNamee's contacts with the forum state. *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.

8 (1984); *accord Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 584-85 (Tex. 2007) (citing *Rush v. Savchuk*, 444 U.S. 320, 329 (1980)) (requiring a "substantial connection" between the defendant's contacts and the facts of the litigation). Notably, the number of McNamee's contacts with Texas is not determinative of the personal jurisdiction analysis; "[e]ven a single, substantial act directed toward the forum can support specific jurisdiction." *Dalton v. R&W Marine, Inc.*, 897 F.2d 1359, 1361 (5th Cir. 1990) (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985)); *see also Ham v. La Cienega Music Co.*, 4 F.3d 413, 415-16 (5th Cir. 1993) ("Purposeful forum-directed activity—even if only a single substantial act—may permit the exercise of specific jurisdiction in an action arising from or related to such acts.").

While the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists, a *prima facie* showing suffices, and Clemens need not establish jurisdiction by a preponderance of the evidence. *Love N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). Moreover, for purposes of this Order, the Court must view all facts contested in the affidavits in favor of jurisdiction. *Id.*; *Wyatt v. Kaplan* 686 F.2d 276, 280 (5th Cir. 1982). A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006). Clemens must therefore establish McNamee's minimum contacts with Texas for each allegation of defamation.

### B.    McNamee's Statements to Mitchell and Heyman

Despite the fact that McNamee allegedly made his statements to Mitchell and Heyman in New York, Clemens, citing *Calder v. Jones*, 465 U.S. 783 (1984), urges the Court to apply the "effects test" to assert jurisdiction. In *Calder*, the *National Enquirer* published an allegedly libelous story about movie star Shirley Jones. Jones filed suit in California against the writer of

the story and his editor, who both lived in Florida.  Neither had significant ties to California: the writer of the story had been there several times on business, and he had called sources in California when researching the story about Jones.   The editor of the story had even less involvement with the state: he had been there twice, once for pleasure and once for business unrelated to the story at issue. Nevertheless, the Supreme Court held that the California courts could properly assert jurisdiction over the two men:

> The allegedly libelous story concerned the California activities of a California resident.  It impugned the professionalism of an entertainer whose television career was centered in California.  The article was drawn from California sources, and the brunt of the harm, in terms of both respondent's emotional distress and the injury to her professional reputation, was suffered in California.  In sum, California is the focal point both of the story and the harm suffered.

*Id.* at 788-789.  The Court noted that the defendants knew the brunt of the injury from the story would be felt by Jones in the state in which she lived and worked.  *Id.* at 789-790.

McNamee argues that his statements were not sufficiently directed at Texas to warrant this Court's jurisdiction.  To support his position, McNamee cites two recent Fifth Circuit cases applying *Calder*.  In the first case, *Revell v. Lidov*, 317 F.3d 467 (5th Cir. 2002), the plaintiff, a former FBI official who lived in Texas, sued a professor who published on the Internet an allegedly libelous article regarding the official's activities at the FBI. The article contained no reference to Texas or the official's Texas activities, and it was not specifically directed at Texas readers.  The defendant, who had never been to Texas, did not even know that the plaintiff lived there.

On the basis of these facts, the Fifth Circuit found that this was not a sufficient relationship to warrant jurisdiction over the defendant, observing that, "[the] [p]laintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction ...."  *Revell*, 317 F.3d at 475.  The Fifth Circuit noted that the article at issue contained no reference to

Texas, did not refer to the Texas activities of Revell, and it was not directed at Texas readers as distinguished from readers in other states. *Id.* at 473. Based on these facts, the Court of Appeals concluded that Texas was not the focal point of the article or the harm suffered. *Id.*

The second case on which McNamee relies is *Fielding v. Hubert Burda Media*, 415 F.3d 419 (5th Cir. 2005). In *Fielding*, the defendant's connections to Texas were at least as tenuous as those found in *Revell*. The plaintiffs were the Swiss Ambassador to Germany and his American wife, a former Mrs. Texas. The defendants were several newspapers who wrote allegedly libelous articles about the plaintiffs' social lives in Berlin. The plaintiffs sued the defendants in Texas, arguing that jurisdiction was warranted by the defendants' miniscule circulation in the state and the fact that the stories harmed their reputations among friends and family in Texas.

The Court of Appeals declined to extend *Calder*, noting that the plaintiffs had not proved that they ever resided in Texas during any time relevant to the suit. *Fielding*, 415 F.3d at 427. The Fifth Circuit reiterated that the plaintiff's occasional residence in Texas was not sufficient to show that the defendant had knowledge that the effects of the story would be felt there: a "more direct aim is required." *Id.* (citing *Revell,* 371 F.3d at 476). The clear focus of the article was on the parties' activities in Germany and Switzerland. *Id.* at 426. The newspapers had interviewed Texas sources, but the Court of Appeals concluded that these "fleeting contacts led to no new substantial disclosures and supplied little more than biographical backdrop." *Id.* Any references to Texas were "merely collateral" to the focus of the article. *Id.* at 426-427. Additionally, the brunt of the harm plaintiffs suffered was experienced in Europe, not Texas. *Id.* at 427.

Unlike the defendants in *Revell* and *Fielding*, McNamee knew that Clemens would feel the brunt of the harm from his statements in Texas. By his own admission, McNamee traveled to

Texas 24 to 31 times to train Clemens and other professional athletes; each visit lasted approximately five days. He knew that Clemens had strong personal and professional ties to the state. McNamee stayed with the Clemens family during many of his visits, and Clemens had told him that he was planning on opening a fitness center in Texas sometime in 2008 or 2009. (Doc. No. 48, Ex. B at 197.)

Clemens's jurisdictional argument ultimately fails, however, because the focal point of McNamee's publication was not Texas. According to his affidavit, McNamee told Mitchell, and later Heyman, that he injected Clemens with steroids and HGH in Clemens's New York apartment, during the time that Clemens was pitching for the Yankees.[2] As the Fifth Circuit held in *Revell*, "the sources relied upon and activities described in an allegedly defamatory publication should in some way connect with the forum if *Calder* is to be invoked." 371 F.3d at 474. McNamee's statements to Mitchell and Heyman did not mention Texas, they were not drawn from Texas sources, and, if anything, they was just as likely to attract the interest of New York Yankees fans as that of Houston Astros fans. The geographic focus of McNamee's statements was undoubtedly New York. Clemens's claims regarding McNamee's statements to Mitchell and Heyman should therefore be dismissed without prejudice to Clemens filing in another forum.

## IV.     THE LEGAL ADEQUACY OF CLEMENS'S ALLEGATIONS

McNamee argues that Clemens has failed to state a claim for defamation, for four independent reasons. First, McNamee claims that his statements to the Mitchell Commission are privileged, and therefore cannot form the basis for a defamation action. Second, McNamee alleges that Clemens is time barred from recovering for McNamee's statements to Pettitte.

---

[2] In determining whether personal jurisdiction exists, the Court may consider affidavits and other recognized forms of discovery. *Jobe v. ATR Marketing, Inc.*, 87 F.3d 751, 753 (5th Cir. 1996).

Third, McNamee contends that Clemens's Amended Complaint does not provide him sufficient notice of the alleged defamatory statements. Finally, McNamee argues his alleged statements to Pettitte were not defamation as a matter of law, and that Clemens has failed to plead special damages.

### A.      Legal Standard

When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65 (2007)).

### B.      Statute of Limitations

McNamee appears to concede that this Court has jurisdiction over Clemens's claims regarding McNamee's statements to Pettitte because they were allegedly made in Texas. McNamee argues, however, that these claims should be dismissed because they are barred by the statute of limitations. In Texas, a plaintiff must bring an action for malicious libel or slander no later than one year after the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN. § 16.002(a). In defamation cases, the cause of action accrues on the date the allegedly defamatory statement is published. *Wheeler v. Methodist Hospital*, 95 S.W.3d 628, 637 (Tex. App.—Houston 2002, no pet.). Clemens alleges that McNamee made the defamatory statements to Pettitte sometime in 1999-2000, and again in 2003-2004. At the very latest, then, the statute

of limitations for these two defamatory acts would have run in 2001 and 2005, respectively. As Clemens did not file the present action until 2007, his claims are untimely.

In his defense, Clemens pleads the discovery rule. Under the rule, accrual of the cause of action is deferred until a plaintiff discovers, or, through the exercise of reasonable care and diligence, should have discovered the nature of the injury. *Id.* (citing *Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998)). The discovery rule applies when the nature of the injury incurred is inherently undiscoverable and the evidence of the injury is objectively verifiable. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (quotations omitted). The rule is invoked only if the matter is not public knowledge. *Wheeler*, 95 S.W.3d at 637. In a trial on the merits, the party seeking the benefit of the discovery rule to avoid limitations has the burden of pleading and proving the discovery rule. *See Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 n. 3 (Tex. 1999).

The parties agree that McNamee's publication to Pettitte was not a public event; there is no suggestion that any third party was present at the time these statements were made. McNamee argues, rather, that based on conversations Clemens had with Pettitte in 2005, or conversations he allegedly overheard between Pettitte and McNamee, which occurred sometime before 2007, Clemens should have reasonably known that McNamee told Pettitte that Clemens was using steroids and HGH. In support of this argument, McNamee cites his own congressional testimony, and that of Pettitte. Clemens has properly pled that he did not know that McNamee had accused him of using steroids or HGH until the Mitchell Report was published on December 13, 2007 (Pl. Am. Compl. ¶¶ 44 and 52), and that he did not learn of McNamee's statements to Pettitte until sometime in 2008. (*Id.* at ¶ 36.) Furthermore, Clemens has presented extrinsic

evidence in which he directly controverts McNamee and Pettitte's accounts of the 2005 conversations. (Doc. No. 40, Ex. 12 at 42-43.)

Since both sides have presented extrinsic evidence to support their position, the Court will exercise its discretion, pursuant to FED. R. CIV. P. 12(d)(2), to convert McNamee's pleading from a Rule 12(b)(6) motion to a Rule 56 motion.[3]  A motion for summary judgment under Rule 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.

Whether Clemens learned of McNamee's statements to Pettitte in 2005, or sometime later, is material to the Court's application of the discovery rule.  McNamee testified before Congress that, at one point, when he was training both Pettitte and Clemens, Pettitte turned to McNamee and said, within earshot of Clemens, "why didn't you tell me about this stuff?" (Doc. No. 40, Ex. 5 at 28-31.)  McNamee then explained to Pettitte why he should not use HGH.  (*Id.*)

---

[3] Rule 12(d) reads: "If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside of the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Since both sides submitted extrinsic evidence to the Court on the discovery rule issue, the parties were on notice that the Court might exercise its discretion to apply Rule 56.  *Isquith v. Middle South Utilities*, 847 F.2d 186, 194 n. 3 (5th Cir. 1988).

McNamee now claims that this conversation should have put Clemens on notice that McNamee had previously told Pettitte that Clemens used HGH.

Pettitte recounts a conversation that he had with Clemens in 2005, during which he asked Clemens what he would do if a reporter asked him about performance enhancing drugs.  (Doc. No. 40, Ex. 2 ¶¶ 4-6.)  Pettitte pointed out that Clemens had once told him that he used performance enhancing drugs.  (*Id.*)  Clemens told Pettitte that he must have misunderstood, because it was Clemens's wife Debbie who had used HGH.  (*Id.* at ¶ 5.)  McNamee claims that this conversation also should have put Clemens on notice that McNamee told Pettitte about his steroid use, because no one but McNamee knew that Clemens used steroids.

The Court cannot conclude, as a matter of law, that either of these conversations would have put Clemens on notice that McNamee had spoken to Pettitte about Clemens's steroid or HGH use.  Even assuming that Clemens did not dispute the conversations, a reasonable jury could find that, in the first conversation, Clemens merely overheard McNamee telling Pettitte why he should not use HGH.  As to the second conversation, a jury could conclude that Clemens believed that Pettitte really had misunderstood their previous conversation about Debbie Clemens's HGH use.

Additionally, McNamee argues that, because he voiced concerns about Clemens's steroid use to Clemens's agent, Jim Murray in 2003, Clemens should have been on notice that McNamee had also spoken to Pettitte.  Clemens claims that he did not learn about this conversation until sometime after it happened.  (Doc. No. 48, Ex. CC at 120.)  A reasonable jury could easily conclude that this statement would not put Clemens on notice that McNamee was discussing his steroid use with other players, such as Pettitte.  Finally, McNamee argues that, because Pettitte and Clemens discussed steroid use after the Grimsley report was released in

2006, Clemens should have been on notice that McNamee told Pettitte that Clemens used performance enhancing drugs. The record merely indicates that the two men discussed the report, however, and that Pettitte asked Clemens what he was going to tell reporters. Clemens responded that he would tell reporters the truth. (*Id.* at 175.) Clemens claims that he knew Pettitte was upset that day, but that he did not know why. (*Id.* at 172.) Viewing the facts in the light most favorable to Clemens, a reasonable jury could find that, if he had not actually used steroids, he would have no reason to believe that Pettitte suspected his use, and no reason to believe that McNamee was the source of Pettitte's suspicions. Because many of the above facts are disputed, and because a reasonable jury could interpret the facts in a variety of ways, based on the witnesses' credibility, the Court holds that summary judgment as to the discovery rule should be denied.

### C.    Immunity for Statements Made During a Judicial Proceeding

McNamee argues that his statements to the Mitchell Commission are privileged, and therefore cannot form the basis for a defamation action.[4]   The Court has already determined that it does not have personal jurisdiction over McNamee with respect to his statements to Mitchell. In the alternative, the Court now finds that McNamee's statements to Mitchell should be treated with immunity.

Based on statements made by McNamee's counsel at oral argument, the Court requested that McNamee submit additional evidence of a judicial proceeding, including statements from the prosecutors and investigators involved, any judicial records, and evidence that McNamee's statements were not voluntary. (Doc. No. 59.) In response, McNamee submitted three

---

[4] The Court notes that McNamee's immunity argument is intended to extend only to his statements to the Mitchell Commission, and that he appears to recognize that this argument would not reach his alleged statements to Pettitte or Heyman.

declarations, including two declarations from his own counsel and one from Assistant United States Attorney Matthew A. Parrella.

Since the material submitted by McNamee is "comprehensive and will enable a rational determination of summary judgment," the Court will again evaluate this part of McNamee's argument under Rule 56. *Isquith*, 847 F.2d at 194 n. 3 (citing 5 C. WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (1969)).  The Court requested additional material from McNamee in a written order, giving the parties sufficient notice that it might consider this argument under Rule 56. *See Isquith*, 847 F.2d at 196.  Clemens has not submitted any evidence controverting the contents of the Declarations.

Under Texas law, statements made to government agencies as part of legislative, judicial, or quasi-judicial proceedings are entitled to absolute immunity so long as they are made as part of an ongoing proceeding, they are not unsolicited, and they are made to an agency whose findings need not be approved or ratified by another agency. *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 994 (5th Cir. 1999) (*citing Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987), *Zarate v. Cortinas*, 553 S.W.2d 652, 655 (Tex.Civ.App.—Corpus Christi 1977, no writ), *Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex.App.—San Antonio 1997, no writ), *and Parker v. Holbrook*, 647 S.W.2d 692, 695 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.)).  It is McNamee's contention that his allegedly defamatory statements stemmed from his cooperation with federal officials when he was under threat of federal prosecution.

In *Shanks v. Allied Signal Inc.*, the Fifth Circuit considered whether such immunity should be given to statements made during the context of a National Transportation Safety Board investigation.  After reviewing Texas law, the Fifth Circuit determined that, even though the Texas Supreme Court had never spoken to the specific issue of whether statements made to

NTSB investigators were protected by absolute immunity, the Court would most likely find these statements to be covered. In coming to this conclusion, the Fifth Circuit recognized that, when communications relate to an ongoing proceeding, absolute immunity applies. It thus held that, under Texas law, statements made to NTSB investigators were subject to absolute immunity.

According to Assistant United States Attorney Parrella, he interviewed McNamee as part of an investigation into the distribution of anabolic steroids, human growth hormones, and money laundering. (Parrella Decl., Dec. 17, 2008, ¶ 1.) McNamee and his counsel met with Parrella, FBI agents, and IRS agents numerous times. (*Id.* at ¶ 2.) McNamee was told, prior to the interviews, that he was not a target of the investigation, but that his "witness status would be subject to review if he chose not to co-operate." (*Id.* at ¶ 3.) McNamee's statements during the interview were given use immunity, and he was told that he was subject to prosecution for making false statements. (*Id.*)

It was Parrella who requested that McNamee speak to the Mitchell Commission. Parrella told McNamee that speaking to the Mitchell Commission was part of his co-operation with the investigation in order to maintain his witness status. (*Id.* at ¶ 4.)   Prior to the interviews with the Mitchell Commission, Parrella told McNamee that the proffer agreement would cover the interviews and that he could face prosecution for any false material statements. (*Id.*) McNamee agreed to these terms, and he participated in three interviews with the Mitchell Commission. (*Id.*) The interviews were all arranged by either agents or Assistant United States Attorneys. Agents and Assistant United States Attorneys participated, either in person or via phone, in all interviews between McNamee and the Mitchell Commission. (*Id.*)

Parrella's investigation, much like the NTSB investigation at issue in *Shanks*, was an ongoing proceeding. *Shanks*, 169 F.3d at 994. All of McNamee's interviews with Mitchell were

scheduled by prosecutors or federal agents. Parrella compelled McNamee to speak to Mitchell, in effect, by warning him that, if he did not cooperate, his witness status could change. Parrella also warned McNamee that, if he lied to Mitchell, he could be subject to a federal prosecution. As a matter of public policy, McNamee's statements to Mitchell should be protected. As the court observed in *Darrah v. Hinds*, "the proper administration of justice requires full disclosure from witnesses without fear of retaliatory lawsuits for defamation of any sort." 720 S.W.2d 689, 691 (Tex. App.—Fort Worth 1986, ref. n.r.e.) (citing *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982)).

Finally, Clemens argues that the privilege only entitles McNamee to a defense, and not immunity from suit. In support of his position, he cites *In re Lee*, 995 S.W.2d 774 (Tex. App.—San Antonio 1999, no pet.). In *Lee*, the Texas Court of Appeals held that the "history and use of the privilege indicate that its intended purpose is to provide merely a defense to defamation claims, not an absolute immunity from those claims." *Id.* at 776. While the Court believes that this language in *Lee* is a departure from the Texas Supreme Court's holding in *Thomas v. Bracey*, in which it said that "communications made in the course of a judicial proceeding *may not serve as the basis of a civil action for libel or slander*, regardless of the negligence or malice with which they are made," 940 S.W.2d at 342-343 (emphasis added), the result in the instant case is the same if the Court treats McNamee's argument as an affirmative defense rather than grounds for absolute immunity. Since Clemens does not dispute Parrella's Declaration, the Court finds, pursuant to Rule 56, that McNamee was compelled to make his statements to Mitchell as part of a judicial proceeding.

### D.    Specificity of Clemens's Defamation Claims

McNamee next argues that Clemens's defamation claims fail because the alleged defamatory statements are not described with enough specificity in Clemens's Amended Complaint. In support of this argument, McNamee cites *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir. 1979), an Eighth Circuit case requiring defamation plaintiffs to include the exact language of the defamatory statement in their pleadings. McNamee contends that Clemens has failed to satisfy this requirement because his Amended Complaint does not cite the exact portions of the Mitchell Report, or McNamee's exact statements to Heyman and Pettitte, which Clemens believes are slanderous. McNamee also asserts that Clemens's claims regarding his alleged statements to Pettitte are deficient because Clemens fails to specify during which year these statements occurred.

With respect to McNamee's statements to Mitchell and Heyman, this argument is moot, since the Court has determined that it does not have personal jurisdiction over McNamee with respect to these claims. As to the claims regarding McNamee's statements to Pettitte, McNamee himself did not recall the exact dates of the conversation; there is no way that Clemens could possibly identify the specific year the conversations took place. Nevertheless, the Court will require Clemens to amend his Complaint to provide the exact statements McNamee made to Pettitte that Clemens considers defamatory, as well as more detail about the context of each conversation.

### E.      Defamation As A Matter of Law

McNamee argues that his alleged statements to Pettitte are not defamatory as a matter of law. First, McNamee argues that Clemens's Amended Complaint does not allege that he told Pettitte that Clemens was using the steroids illegally, or for non-medical purposes. Second, he contends that the Amended Complaint does not, on its face, allege McNamee told Pettitte that

Clemens was knowingly using steroids.  Instead, McNamee argues that a reasonable person could infer, based on the Amended Complaint, that Clemens was not aware of the injections' contents.  McNamee next argues that it was Pettitte who told him in 1999 or 2000 that Clemens had used HGH.  Finally, McNamee contends that his statements made to Pettitte during 2003 or 2004 regarding Clemens's illegal steroid use were not defamation as a matter of law because Pettitte "paid these statements no mind" and because Pettitte himself was already using performance enhancing drugs at this time.

A statement is defamatory if it exposes a person to "public hatred, contempt or ridicule, or financial injury or [if it] impeach[es] any person's honesty, integrity, virtue, or reputation." *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 73.001).  Publication of defamatory words means to communicate the words, either orally, in writing, or in print, to a third person capable of understanding their defamatory import and in such a way that the third person would understand. *Id.*  Whether a publication is capable of the defamatory meaning alleged by the plaintiff is a question of law to be determined by the court. *Id.* (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)).  When a publication is of ambiguous or doubtful import, however, the jury must determine its meaning.  The threshold question is therefore whether the complained of statements are reasonably capable of a defamatory meaning. *Id.*  The allegedly defamatory statement "must be construed as a whole, in light of surrounding circumstances, based upon how a person of ordinary intelligence would perceive the entire statement." *Moore v. Waldrop*, 166 S.W.3d 380, 385 (Tex. App.—Waco 2005, no pet.) (citing *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004)).

The Court finds that McNamee's statements to Pettitte are reasonably capable of defamatory meaning. Given that Clemens was a professional baseball player in peak physical condition, it is likely that Pettitte understood that Clemens was using HGH or steroids without a prescription from a medical doctor. A jury could also find, based on McNamee's status as Clemens's employee, that Clemens knew of and could control the injections' contents. Finally, Pettitte's own use of steroids does not reduce the defamatory content of McNamee's statements. The statements were still capable of damaging Pettitte's opinion of Clemens's honesty and integrity, and his pitching ability, regardless of Pettitte's own shortcomings.

McNamee argues that, even if Clemens has successfully presented a defamation claim, he has failed to plead a claim for defamation *per se*, and he is therefore required to plead special damages. In Texas, there are two classifications of slander. A statement is slander *per se* if it (1) imputes the commission of a crime; (2) imputes the contraction of a loathsome disease; (3) would cause injury to a person's office, business, profession, or calling; or (4) imputes sexual misconduct. *Id* at 384. To determine whether a statement is slander per se, "the test is what construction would be placed upon such language by the average reasonable person or the general public, not by the plaintiff." *Id.* at 386 (citing *Schauer v. Memorial Care Syst.*, 856 S.W.2d 437, 448 (Tex. App.—Houston [1st. Dist.] 1993, no writ)). If the statement seen in this light has but one clear and obvious meaning, then no further inquiry is necessary. *Id.* (citing *Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App.—Corp. Christi 1997, writ denied)). If the statement is slander *per se*, no independent proof of damage to the plaintiff's reputation or of mental anguish is required, as the slander itself gives rise to a presumption of these damages. *Id.*

If the statement is ambiguous, or if the full effect of the statement cannot be understood without extrinsic evidence, then the trial court must consider the explanatory circumstances. *Id.* at 386 (citing *Montgomery Ward & Co. v. Peaster*, 178 S.W.2d 302, 305 (Tex. Civ. App.— Eastland 1994, no writ). Once the court considers extrinsic evidence and innuendo, the statement becomes slander *per quod*, because innuendo not only reflects the meaning of the statement but also "illuminates the amount of harm the plaintiff may have suffered." *Id.* at 386.  If a statement is slander *per quod*, the plaintiff must present proof of actual damages.  In other words, "the plaintiff must prove that those to whom the statement was published understood the meaning that the plaintiff attaches to the statement." *Id.*

Clemens claims that he has pleaded slander *per se*, because McNamee's statements to Pettitte imply that he engaged in illegal activity and would cause injury to his profession. Given that McNamee did not specifically tell Pettitte that Clemens was using the steroids knowingly and without a prescription, McNamee statements to Pettitte do not rise to the level of slander *per se*. The Court will allow Clemens to amend his Complaint to include special damages.

## III.   VENUE

McNamee's final argument is that the case should be transferred to either the Southern or Eastern District of New York, pursuant to 28 U.S.C. § 1404(a).  Under § 1404(a), a correctly filed case may be transferred to another proper venue "[f]or the convenience of parties and witnesses, in the interest of justice." The case was removed, and nothing in § 1441, the statute governing removal, restricts the authority of the district court to transfer or dismiss the action on the grounds of inconvenient forum. 28 U.S.C. § 1441(e)(6). Venue of a removed action is governed by 28 U.S.C. § 1441.  That statute reads, "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the

defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Accordingly, venue is proper in the Houston Division of the United States District Court for the Southern District of Texas, which is the district and division embracing Harris County where the action was pending at the time of removal. In addition, the action could have been filed in either the Southern or Eastern District of New York. *See* 28 U.S.C. § 1391(a).

McNamee, as the movant under Section 1404(a), bears the burden of establishing the propriety of the transfer. *In re: Volkswagen of America, Inc.*, 545 F.3d 304, 314 (5th Cir. 2008) (en banc). The movant must "show good cause." *Id.* (citing *Humble Oil & Ref. Co. v. Bell Marine Serv.*, 321 F.2d 53, 56 (5th Cir. 1963)). Good cause means that "a moving party, in order to support its claim for a transfer, must satisfy the statutory requirements and clearly demonstrate that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.' Thus, when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Id.* at 315 (distinguishing the heavier burden under the *forum non conveniens* standard where the movant must show that the factors "substantially outweigh" the plaintiff's choice of venue). A plaintiff's choice of forum is given more deference when he has chosen his home forum. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981).

The Supreme Court set forth private and public factors to be weighed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), and reaffirmed them in *Piper*, 454 U.S. 235 (1981). The Fifth Circuit adopted the *forum non conveniens* factors for the § 1404(a) context. *Humble Oil*, 321 F.2d at 56; *In re Volkswagen*, 545 F.3d at 314 n. 9. The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other

practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen*, 545 F.3d at 314 (citing *Piper Aircraft*, 454 U.S. at 241 n. 6). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.*

Given that the only remaining claims are based on McNamee's statements to Pettitte, which occurred in Texas, the Court does not believe it would be in the interest of justice to transfer venue.  The private factors weigh against such a transfer.  Pettitte, who will be the central witness, lives in the Houston area and is subject to the subpoena power of this Court.  The cost and burden of travel imposed on Pettitte will be minimal.  The public interest factors also weigh against a transfer.  Since the alleged defamatory act occurred in Texas and will be adjudicated under Texas law, Texas has a strong interest in having the trial occur in Houston. Based on the remaining claims, the Court does not see a compelling reason to upset Clemens's choice of venue.

## III.    CONCLUSION

The Court is fully aware that the result reached is a counter-intuitive one, creating the potential for related proceedings pending in jurisdictions many miles apart.  This is, however, a result mandated by well-established precedents that the Court is not at liberty to ignore or distort. McNamee's Motion to Dismiss is therefore **GRANTED IN PART** as to the claims based on McNamee's alleged statements to Mitchell and Heyman.  The Motion is **DENIED IN PART** with respect to McNamee's alleged statements to Pettitte.  Clemens is granted leave to amend his Complaint, within thirty days, to include McNamee's specific statements to Pettitte which

23

Clemens considers defamatory, as well as more details about the context of those statements.

Clemens is also given leave to amend his Complaint to include special damages.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the _12th_ day of February, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY
AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN
SENT ONE BY THE COURT.**